

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2016 FEB -3 AM 11: 32

TS

CLERK OF COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

PHILLIP TURNER §
Plaintiff, §
§
v. §
§  CIVIL ACTION NO. 4:15-cv-00824-A
LIEUTENANT DRIVER, §
OFFICER GRINALDS, Badge 3825, §
OFFICER DYESS, Badge 2586, §
Defendants. §

## PLAINTIFF'S RESPONSE AND BRIEF IN RESPONSE TO DEFENDANTS GRINALDS, DYESS, AND DRIVER'S MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND BRIEF IN SUPPORT

## ADDENDUM A

*Buehler v. City of Austin et al*, No. A-13-CV-1100 ML (W.D. Tex. July 24, 2014) (Order denying motions to dismiss)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| ANTONIO FRANCIS BUEHLER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | A-13-CV-1100 ML |
| | § | |
| CITY OF AUSTIN/AUSTIN POLICE | § | |
| DEPARTMENT; AUSTIN POLICE | § | |
| CHIEF ART ACEVEDO; AUSTIN | § | |
| POLICE OFFICER PATRICK OBORSKI; | § | |
| AUSTIN POLICE OFFICER ROBERT | § | |
| SNIDER; AUSTIN POLICE OFFICER | § | |
| JUSTIN BERRY; SERGEANT ADAM | § | |
| JOHNSON; AND JOHN DOES A–Z WHO | § | |
| ARE UNKNOWN TO THE PLAINTIFF | § | |
| AT THIS TIME BUT ARE IN THE | § | |
| CHAIN OF COMMAND FOR THE | § | |
| AUSTIN POLICE DEPARTMENT, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Rule 12(b)(1)&(6) Motion to Dismiss (Clerk's Dkt. No. 18), filed March 17, 2014; Plaintiff's Response to Defendants' Rule 12(b)(1)&(6) Motion to Dismiss (Clerk's Dkt. No. 30), filed April 18, 2014; Defendants' Reply to Plaintiff's Response to Defendants' Rule 12(b)(1)&(6) Motion to Dismiss (Clerk's Dkt. No. 33), filed April 24, 2014; Plaintiff's Reply to Defendants' Reply to Plaintiff's Response to Defendants' Rule 12(b)(1)&(6) Motion to Dismiss (Clerk's Dkt. No. 45), filed June 2, 2014; Brief *Amicus Curiae* of National Press Photographers Association (Clerk's Dkt. No. 45-1), filed June 2, 2014; Defendants' Supplemental Rule 12(b)(1)&(6) Reply (Clerk's Dkt. No. 47), filed June 6, 2014; and Defendants' Advisory to the Court (Clerk's Dkt. No. 53), filed July 16, 2014.

# ADDENDUM A

1

The parties consented to this Court's jurisdiction, and the case was assigned to this Court's docket for all purposes on March 18, 2014. Clerk's Dkt. No. 21. Having considered the briefing and the applicable case law, the motion is **GRANTED IN PART** and **DENIED IN PART** as fully set forth below.

## I.   BACKGROUND

On December 31, 2013, Plaintiff Antonio Francis Buehler ("Buehler") filed this lawsuit, naming as Defendants the City of Austin ("the City")/the Austin Police Department ("APD"),[1] Chief of Police Art Acevedo ("Acevedo"); Police Officer Patrick Oborski ("Oborski"); Police Officer Robert Snider ("Snider"); Police Officer Justin Berry ("Berry"); Sergeant Adam Johnson ("Johnson," and collectively, "the Officers"); and John Does A through Z who are unknown to the Plaintiff at this time but are in the chain of command for the Austin Police Department (collectively, "Defendants"). Buehler's Second Amended Complaint, filed June 23, 2014, alleges as follows:[2]

On January 1, 2012, Buehler witnessed Oborski and Snider engaged in a traffic stop in the parking lot of a 7-11 where Buehler had stopped to refuel his truck. The passenger in the vehicle that had been stopped by Oborski and Snider began screaming, and Buehler observed the passenger "being yanked violently" out of the stopped vehicle and "taken to the ground by Officer Snider." Clerk's Dkt. No. 52 at 4. Oborski then "ran up to join the assault of the passenger." *Id.* "Without stepping more than a couple of steps away from his truck," Buehler took out his phone to take pictures of the incident. *Id.* The passenger, who was crying and appeared to be in pain, then

---

[1] Buehler has named the City/APD as a single defendant. The claims against APD must be dismissed because APD is not an entity capable of being sued. *See Darby v. Pasadena Police Dep't*, 939 F.2d 311, 314 (5th Cir. 1991) (recognizing that a police department is not a legal entity with the capacity to engage in litigation); *Guerrero v. Travis County*, No. A-11-CA-452-SS, 2011 WL 2443671, at *4 (June 13, 2011) ("[T]he Austin Police Department is not a legal entity capable of being sued."). The Court therefore considers the claims as against the City only.

[2] For the purpose of ruling on the motion to dismiss, the Court accepts as true the facts contained in Buehler's Second Amended Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"screamed out asking [Buehler] to please record the incident." *Id.*

Buehler "asked the police officers why they were abusing the woman and told them to stop abusing her." *Id.* at 5. Oborski and Snider "ignored Mr. Buehler and escorted the passenger toward the furthest police cruiser." *Id.* "Halfway between Mr. Buehler and the police cruiser," Oborski turned and began walking at Buehler "aggressively" and "demanded to know who Mr. Buehler thought he was." *Id.* Buehler stated that he was "doing nothing wrong" and "was allowed to take photos," and backed away from Oborski, while keeping his "hands open down his sides" and palms facing Oborski. *Id.* Oborski pushed Buehler in the chest, chuckled, accused Buehler of spitting on him, grabbed Buehler's arm, and put Buehler into a choke hold. Oborski then forced Buehler to the ground. Snider "ran up and put Mr. Buehler's left arm in an arm lock, and began to apply pressure to the elbow as if [Snider] were trying to dislocate it." *Id.* at 6. Other unknown officers arrived on the scene and began to verbally harass Buehler. Buehler was then arrested for Resisting Arrest, Search, or Transportation.[3] Buehler filed a complaint with APD Internal Affairs, but no action was taken in regard to his complaint.

As a result of this incident, Buehler formed an organization called the Peaceful Streets Project, whose mission is to help "individuals understand their rights and hold law enforcement officials accountable." *Id.* at 7. The organization "routinely video-tap[es] officer conduct in order to prevent and document police brutality." *Id.* Buehler believes his subsequent encounters with law enforcement, described below, "occurred in retaliation for the formation of an organization that

---

[3]Buehler does not specify in the Second Amended Complaint the crime for which he was arrested on January 1, 2012. The Court takes judicial notice of the public records related to this arrest, available on the Travis County Clerk's website, http://www.traviscountyclerk.org/eclerk/, which specify that Buehler was arrested on this date for Resisting Arrest, Search, or Transportation. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (approving judicial notice of public records by district court reviewing motion to dismiss). The Court finds that this fact is not subject to reasonable dispute because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See id.* (citing Fed. R. Evid. 201(b)).

empowers citizens to know their civil rights . . . ." *Id.* at 9. Buehler also states that "Chief of Police Art Acevedo became aware of the January 1 incident shortly after it occurred" and "assured Mr. Buehler that a proper investigation would be accomplished," but "[d]espite this personal knowledge and personal assurances, the civil rights violations continued." *Id.* at 16.

On August 26, 2012, Buehler was in downtown Austin with three other members of the Peaceful Streets Project when he observed a young man being detained. Buehler filmed the officers as they arrested the man and walked him to the police station. Berry approached Buehler and "yelled at Mr. Buehler to back up." *Id.* at 10. Berry then arrested Buehler for Interference with Public Duties and seized Buehler's camera, which to date has not been returned to Buehler. Buehler again filed a complaint with APD Internal Affairs, but no action was taken in regard to the complaint.

On September 21, 2012, while driving in downtown Austin with members of the Peaceful Streets Project, Buehler observed a traffic stop. He pulled over and exited his car. When Buehler was approximately 30 feet from the traffic stop, Oborski instructed Buehler over a loudspeaker to back up. Buehler was filming the traffic stop, and complied with Oborski's request by backing up approximately 10 to 15 feet. "While Mr. Buehler was backing up[,] he asked how far he should back up and Officer Oborski yelled[,] 'Until I say stop!'" *Id.* at 11. "About 90 seconds later," Johnson arrived at the traffic stop and instructed Buehler to move toward the rear of the traffic stop, contradicting the instructions from Oborski. Oborski was interrogating a female suspect on the sidewalk between Buehler and Johnson. Buehler continued to back away from the traffic stop, believing that Johnson was "trying to trick [him] into walking" toward Oborski. *Id.* at 12. Buehler asked Johnson how far away from the traffic stop he needed to be "in order to be free to document the actions of" Oborski. *Id.* Johnson continued to say that Buehler's only option was to move toward and past Oborski and that "backing up any distance was not going to be sufficient." *Id.* at

4

13. After backing an estimated 80 to 100 feet away from the traffic stop and being told his only options were to move toward and past Oborski or leave the scene, "Johnson then grabbed Mr. Buehler's arm, handcuffed him and informed him he was under arrest just as Mr. Buehler told Sergeant Johnson that he was leaving." *Id.* Buehler was again charged with Interference with Public Duties. His camera was seized and to date has not been returned. Buehler filed a complaint with APD Internal Affairs, but no action was taken in regard to the complaint.

Buehler filed suit under 42 U.S.C. Section 1983 ("Section 1983"), alleging that the Officers violated his First and Fourteenth Amendment rights "when they interfered with Mr. Buehler's efforts to exercise his [F]irst [A]mendment right to film and publish [the Officers'] conduct." *Id.* at 20. He further alleges violations of the Fourth and Fourteenth Amendments, specifically false arrest, excessive force, unlawful search and seizure, and malicious prosecution. Buehler also asserts claims under Sections 8, 9, 17, 19, and 27 of the Bill of Rights to the Texas Constitution and state-law claims for conversion and false arrest and imprisonment.

With respect to the City and Acevedo, Buehler alleges that they are liable for the Officers' actions because they failed to establish a policy regarding "how Austin police officers should proceed when a private citizen records their conduct." *Id.* at 16. Alternatively, Buehler contends that the City and Acevedo are liable because they failed to properly train and supervise the Officers if they did have such an established policy. Finally, Buehler alleges that the City and Acevedo ratified the Officers' conduct because these Defendants knew of the alleged civil rights violations and took no action to remedy the alleged violations or prevent further violations from occurring.

Defendants filed their motion to dismiss, to which Plaintiff responded. Plaintiff also submitted additional briefing from the National Press Photographers Association regarding the First Amendment issue. The motion is now ripe for the Court's consideration.

## II.    STANDARDS OF REVIEW

### A.    Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). A claim is properly dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) "when the court lacks the statutory or constitutional power to adjudicate the claim." *Id.* (citation and internal quotation marks omitted).

"Lack of subject-matter jurisdiction may be found in the complaint alone, the complaint supplemented by the undisputed facts as evidenced in the record, or the complaint supplemented by the undisputed facts plus the court's resolution of the disputed facts." *Id.* at 287 (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). A motion brought under Rule 12(b)(1) should be granted only "if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *Id.* (citing *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007)).

### B.    Rule 12(b)(6)

Rule 8 of the Federal Rules of Civil Procedure mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard demands more than "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. v. Twombly*, 550 U.S. 544, 555–57 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570.

The Supreme Court has made clear that this plausibility standard is not a "probability

6

requirement," but does impose a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although "a court must accept as true all of the allegations contained in a complaint," that tenet is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court assumes the veracity of the well-pleaded factual allegations and construes the facts alleged "in the light most favorable to the nonmoving party." *Doe v. Robertson*, 751 F.3d 383, 386–87 (5th Cir. 2014) (citations and internal quotation marks omitted).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, in considering a motion to dismiss, the court must initially identify pleadings that are no more than legal conclusions not entitled to the assumption of truth, then assume the veracity of well-pleaded factual allegations and determine whether those allegations "plausibly give rise to an entitlement to relief." *Id.* If not, "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## C.   Qualified Immunity

Qualified immunity protects state officials from civil damages liability under Section 1983 in their individual capacities unless a plaintiff pleads "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (citation omitted). The Fifth Circuit has characterized evaluation of qualified immunity as "a two-step process," with "the burden [] on the plaintiff to prove that a government official is not entitled to qualified immunity." *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013) (citing *Michalk v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005)).

7

First, the plaintiff must allege a violation of a clearly established right. *Id.* Conduct violates a clearly established right when the contours of the right are sufficiently clear that every reasonable official would have understood that the conduct at issue violates the right. *al-Kidd*, 131 S.Ct. at 2083. To find that a right is clearly established, the court "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (quoting *al-Kidd*, 131 S.Ct. at 2084) (internal quotation marks omitted). Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S.Ct. at 2083. The Supreme Court recently reiterated this "beyond debate" standard in *Lane v. Franks*, 134 S.Ct. 2369, 2383 (2014).

Second, the court must determine whether the defendant's conduct as alleged was reasonable. *Wyatt*, 718 F.3d at 503. Put another way, "[f]or immunity to apply, the actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (citation and internal quotation marks omitted); *see also Morgan*, 659 F.3d at 372 ("The *sine qua non* of the clearly-established inquiry is fair warning," meaning that the "right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." (citations and internal quotation marks omitted)).

At the motion to dismiss stage, a district court must find that the plaintiff's pleadings assert facts that, accepted as true, defeat the defense of qualified immunity. *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014). "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.*

8

(quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)) (internal quotation marks omitted).

### III.  ANALYSIS

#### A.  First Amendment Claims

##### 1.  *First Amendment Protection for Recording Police Officers*

Defendants argue that Buehler's First Amendment claim should be dismissed because the right to photograph or videotape police officers "is not recognized as a constitutional right." Clerk's Dkt. No. 18 at 6.  Several First Amendment principles are implicated by Buehler's contention that such a right exists.  First is the right to assemble in a public forum.  "Traditional public fora include public streets and parks, which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *de la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 503 (5th Cir. 2005) (quoting *Perry Educ Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)) (internal quotation marks omitted).  Restrictions on speech in public fora are closely scrutinized and are valid only if content neutral and necessary to serve a compelling government interest.  *Id.*  Simply put, citizens have the right to be present in a public forum.  *See United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) ("[T]he rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights.").  The Supreme Court has long acknowledged that the right to assemble is "intimately connected both in origin and in purpose, with the other First Amendment rights of free speech and free press."  *Id.*

The next principle implicated is the right of individuals to speak on matters of public concern, which "is 'at the heart of the First Amendment's protection.'"  *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749,

758–59 (1985) (opinion of Powell, J.)).  "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).  Speech on matters of public concern "'is the essence of self-government.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)).  "Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)) (internal quotation marks omitted).

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 1216 (internal citations, punctuation, and quotation marks omitted).  Fifth Circuit precedent establishes that "speech regarding police misconduct constitutes a matter of public concern." *Teague v. City of Flower Mound*, 179 F.3d 377, 381 (5th Cir. 1999) (citing *Forsyth v. City of Dallas*, 91 F.3d 769, 773–74 (5th Cir. 1996)); *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988)); *see also Kinney v. Weaver*, 367 F.3d 337, 369 (5th Cir. 2004) ("[T]his court has repeatedly emphasized the need to protect speech regarding police misconduct in particular . . . ."); *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001) ("There is perhaps no subset of matters of public concern more important . . . than bringing official misconduct to light." (citation and internal quotation marks omitted)).  From these propositions it follows easily that the First Amendment protects an individual's right to speak in a public forum regarding police misconduct. *See Alexander v. Eeds*, 392 F.3d 138, 147 (5th Cir. 2004) ("Reporting serious police misconduct or corruption is an activity with well-established protections.")

The final principle implicated is that of private individuals to receive and gather information.

Under the First Amendment, "the right to receive information is as equally protected as the right to

convey it." *de la O*, 417 F.3d at 502 (citing *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).

It has long been held that "the First Amendment goes beyond protection of the press and the self-

expression of individuals to prohibit government from limiting the stock of information from which

members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978).

   With respect to gathering information, it is important to note that "the First Amendment does

not guarantee the press a constitutional right of special access to information not available to the

public generally." *Brazenburg v. Hayes*, 408 U.S. 665, 684 (1972); *see also Peavy v. WFAA-TV,

Inc.*, 221 F.3d 158, 185 (5th Cir. 2000) (same); *United States v. Gurney*, 558 F.2d 1202, 1208 (5th

Cir. 1977) ("The First Amendment right to gather news has been defined in terms of information

available to the public generally."). Moreover, given the "proliferation of electronic devices with

video-recording capability" and that "news stories are now just as likely to be broken by a blogger

at her computer as a reporter at a major newspaper," the First Amendment's protection for news

gathering "cannot turn on professional credentials or status." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st

Cir. 2011). As a result, "the public's right of access to information is coextensive with that of the

press." *Id.* at 83; *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 584 (1980)

(Stevens, J., concurring) ("[T]he First Amendment protects the public and the press from abridgment

of their rights of access to information about the operation of their government . . . ."); *Houchins v.

KQED, Inc.*, 438 U.S. 1, 16 (1978) (Stewart, J., concurring) (stating that the Constitution "assure[s]

the public and the press equal access once government has opened its doors."). Thus, a private

individual has the right to receive and gather information on matters of public concern to the same

extent that a member of the press would have the right to receive and gather that information.

   From the foregoing foundational and long-standing principles of constitutional law, a

11

protected right emerges: A private citizen has the right to assemble in a public forum, receive information on a matter of public concern—such as police officers performing their official duties—and to record that information for the purpose of conveying that information.

That is not to say that such a right is without limit. "[N]either the First Amendment right to receive speech nor the First Amendment right to gather news is absolute." *Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996). Courts that have recognized that the right to record police officers is "subject to reasonable time, place and manner restrictions." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see also Glik*, 655 F.3d at 84 (same); *Crawford v. Geiger*, --- F. Supp. 2d ----, 2014 WL 554469, at *11 (N.D. Ohio Feb. 10, 2014) (same). Additionally, the Fifth Circuit has admonished that "[i]t would be frivolous to assert . . . that the First Amendment, in the interest of securing news or otherwise, confers a license . . . to violate valid criminal laws." *Peavy*, 221 F.3d at 185 (quoting *Brazenburg*, 408 U.S. at 691). Thus, to the extent that an individual, in exercising his First Amendment right to film police officers as they execute their official duties, violates a valid criminal law, he cannot plausibly argue that his First Amendment right acts as a shield that protects him from criminal liability.

An obvious tension exists between a police officer and an individual observing and recording that police officer. As previously stated, an individual has a constitutional right to assemble in a public place so as to observe and acquire information related to the police as they perform their official duties. At the same time, a police officer must be free to perform his official duties without undue interference so as to protect the officer and everyone in the vicinity. As this tension plays out, the officer on the scene will be the arbiter of what constitutes a reasonable time, place, and manner for the exercise of the individual's First Amendment right to record.

When a valid criminal law relies heavily on the arresting officer's discretion, a court must

12

be wary of the potential for the law to be used to chill or prohibit speech protected by the First Amendment.  Courts across the country routinely reject police officers' attempts to criminalize protected speech through the use of discretionary charges.  *See, e.g., Norwell v. City of Cincinnati*, 414 U.S. 14, 16 (1973) (per curiam) (reversing disorderly conduct conviction because "one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer"); *Swartz v. Insogna*, 704 F.3d 105, 110–11 (2d Cir. 2013) (finding no probable cause for disorderly conduct arrest because statements and gestures critical of police were protected speech); *Wilson v. Kittoe*, 337 F.3d 392, 401 (4th Cir. 2003) (finding no probable cause to arrest for obstruction when plaintiff spoke to officer and observed arrest of another from his own driveway because "inconvenience cannot, taken alone, justify an arrest under the Obstruction statute"); *Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003) (finding that arguing with a police officer, even if done loudly using profane or offensive language, will not alone constitute disorderly conduct); *Johnson v. Campbell*, 332 F.3d 199, 213 (3d Cir. 2003) (finding no probable cause to arrest when words to officer were protected by First Amendment, even if unpleasant and insulting); *Enlow v. Tishomingo County*, 962 F.2d 501 (5th Cir. 1992) (finding no probable cause to arrest for interference with raid when plaintiff asked officer two questions and took a photograph of the raid in progress); *Gainor v. Rogers*, 973 F.2d 1379, 1387–88 (8th Cir. 1992) (finding arrest not supported by probable cause when plaintiff, "merely exercising his First Amendment rights," expressed a religious message and challenged police officers' actions).

Consequently, "[c]ourts need to be alert to arrests that are prompted by constitutionally protected speech, even when the arrestee's words are directed at a police officer performing official tasks." *Mesa*, 543 F.3d at 27; *see also City of Houston v. Hill*, 482 U.S. 451, 455, 465 n.15 (1987) (rejecting city ordinance that made it a crime to "in any manner oppose, molest, abuse or interrupt

13

any policeman in the execution of his duty" in part because it "effectively grant[ed] police the

discretion to make arrests selectively on the basis of the content of the speech," which the Court

found "particularly repugnant"). "The freedom of individuals verbally to oppose or challenge police

action without thereby risking arrest is one of the principal characteristics by which we distinguish

a free nation from a police state." *Hill*, 482 U.S. at 462–63. "[T]he First Amendment protects a

significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461; *see also*

*Mesa*, 543 F.3d at 273 ("Trained officers must exercise restraint when confronted with a citizen's

anger over police action.").

In sum, based on foundational principles of First Amendment law, the Court concludes that

the First Amendment protects the right to videotape police officers in the performance of their

official duties, subject to reasonable time, place, and manner restrictions. Having determined that

such a right exists, the Court next examines whether the Officers are entitled to qualified immunity

from Buehler's First Amendment claims.

### 2. Was the Right Clearly Established at the Time of Buehler's Arrests?

Defendants argue that the Officers are entitled to qualified immunity on Buehler's First

Amendment claims because, even if the First Amendment protects a right to photograph or videotape

police officers as they execute their official duties, such a right was not clearly established at the time

of Buehler's arrest. As noted above, conduct violates a clearly established right when the contours

of the right are sufficiently clear that every reasonable official would have understood that the

conduct at issue violates the right. *al-Kidd*, 131 S.Ct. at 2083. Although a case directly on point is

not required, "existing precedent must have placed the statutory or constitutional question beyond

debate." *Id.* "The *sine qua non* of the clearly-established inquiry is fair warning," meaning that the

"right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness

14

of his conduct." *Morgan*, 659 F.3d at 372 (citations and internal quotation marks omitted). A recent Supreme Court decision suggests we need look no further than beyond the boundaries of our own Circuit to answer this question. *Lane*, 134 S.Ct. at 2382–83 (2014) (addressing three Eleventh Circuit cases in determining whether a right was clearly established within the Eleventh Circuit and briefly mentioning two cases from two other circuits).

The Fifth Circuit addressed an arrest under similar circumstances in *Enlow v. Tishomingo County*, 962 F.2d 501 (5th Cir. 1992). In that case, the defendant highway patrol officer argued at summary judgment that he was entitled to qualified immunity from the plaintiff's First and Fourth Amendment claims. *Id.* at 503. The plaintiff presented evidence that, during what he believed was an illegal raid on a building he owned, he asked the officer if the officer had a search warrant or an arrest warrant, and then borrowed a camera from a bystander and took a picture of the raid as it was in progress. *Id.* at 504. The plaintiff further maintained that he was arrested for interference with a raid. The Fifth Circuit, accepting the nonmovant plaintiff's evidence as true, found that the plaintiff's evidence presented a cognizable First Amendment claim. *Id.* at 509. In so doing, the Fifth Circuit noted that the plaintiff's speech did not "rise above inconvenience, annoyance, or unrest," nor did it "constitute an incitement to immediate lawless action." *Id.* (citation and internal quotation marks omitted). The Fifth Circuit further affirmed the district court's denial of qualified immunity, reasoning that whether the plaintiff was arrested for interference with the raid or for his protected speech was a question of fact for the jury. *Id.* at 509–10. Although the right to photograph was not explicitly at issue in *Enlow*, the conduct Buehler has alleged is remarkably similar to that of the plaintiff in that case.

The Fifth Circuit has also held that retaliation against a citizen for photographing police

officers constitutes a deprivation of constitutional rights. *See Shillingford v. Holmes*, 634 F.2d 263, 264, 266 (5th Cir. 1981) (stating that police officer's "unprovoked and unjustified" assault of plaintiff who "was photographing what the policeman did not want to be memorialized" and "was not involved in the arrest incident and did not interfere with the police in any fashion" established a deprivation of constitutional rights), *abrogated on other grounds by Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993). The proposition that an individual cannot be retaliated against for expression protected by the First Amendment is uncontroversial. *See Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities." (citation omitted)). In *Enlow* and *Shillingford*, the Fifth Circuit seems to assume, without explicitly stating, that photographing[4] a police officer performing his official duties falls under the umbrella of protected expression.

Additionally, a robust consensus of circuit courts of appeals that have addressed this issue have concluded that the First Amendment encompasses a right to record public officials as they perform their official duties. For example, in 2011, before Buehler's arrests, the First Circuit addressed a set of facts almost identical to those presented here: a claim of qualified immunity in a suit brought by a bystander who was arrested for using his cell phone to record police officers making an arrest on Boston Common. *Glik*, 655 F.3d at 79–80. Based on "[b]asic First Amendment principles, along with case law from this and other circuits," the First Circuit found that there is a constitutionally protected right to videotape police carrying out their duties in public. *Id.* at 82. The court went on to find that this right is clearly established, resting this conclusion primarily on the Supreme Court's observations on the right to gather and disseminate information about the

---

[4]This Court sees no grounds upon which to distinguish photographing from videotaping.

government. *Id.* "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of government affairs.'" *Id.* (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). The court concluded that, "though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment." *Id.* at 85. Accordingly, the court held that the district court did not err in denying the police officers qualified immunity on the bystander's First Amendment claim. *Id.*

Other courts of appeals have also recognized that the First Amendment protects an individual's right to record police officers performing their official duties. *See, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595, 608 (7th Cir. 2012) (stating that making a recording "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording" and finding that plaintiffs were likely to prevail on their claim that state eavesdropping statute interfered with right to record police officers "engaged in their official duties in public places"); *Smith*, 212 F.3d at 1333 (finding, in case involving citizens videotaping police, that "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing, in case involving citizen filming police officers, a "First Amendment right to film matters of public interest").

Federal district courts have concluded similarly. Significantly, in addressing the same question regarding qualified immunity, the Northern District of Ohio recently found that "the First Amendment right to openly record police activity" was clearly established at the time of plaintiffs'

17

August 2012 arrests, despite a lack of authority within the Sixth Circuit. *Crawford*, 2014 WL 554469, at *10. In so doing, the court relied upon foundational constitutional principles announced by the Supreme Court and the above-cited opinions from the First, Seventh, Ninth, and Tenth Circuits. *Id.*; *see also Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504, 513 (D.N.J. 2006) (holding that photographing a police officer in connection with a citizen's political activism was protected under the First Amendment); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) (concluding that plaintiff had a First Amendment right to videotape state troopers conducting truck inspections on a public highway because of his concern regarding the safety of the inspections); *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 94 (D. Mass. 2002) (recognizing in case involving filming local official that "plaintiffs had a constitutionally protected right to record matters of public interest"); *Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) ("It is not just news organizations . . . who have First Amendment rights to make and display videotapes of events—all of us, including [plaintiff], have that right.").

Admittedly, the consensus regarding the existence of a right to record police as they perform their official duties is not universal. The Third Circuit found this right was not clearly established in *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010). In that case, the plaintiff, who was the passenger in a vehicle stopped by a police officer, recorded the police officer during the traffic stop from inside the car. *Id.* at 251. The plaintiff was then arrested for violating the Pennsylvania Wiretap Act. *Id.* Significantly, the plaintiff in *Kelly* was filming from inside a vehicle during the traffic stop, an "inherently dangerous situation[]," rather than at a distance from the officer on a public street, as Buehler alleges he was doing when he was arrested. *Id.* at 262. This fact was central to the Third Circuit's analysis, as was the court's belief that the facts of the cases finding a

18

right to record were "insufficiently analogous to the facts of this case." *Id.* Thus, the Third Circuit found "insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during [a traffic] stop would violate the First Amendment."[5] *Id.*; *see also Szymecki v. Houck*, 353 F. App'x 852, 853 (4th Cir. 2009) (per curiam) (concluding without reciting facts or law that the "First Amendment right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct"). The court further noted that "even insofar as it *is* clearly established, the right to record matters of public concern is not absolute; it is subject to reasonable time, place, and manner restrictions." *Kelly*, 622 F.3d at 262 (emphasis in original).

Defendants refer the Court to *Gravolet v. Tassin*, an unreported decision from the Eastern District of Louisiana, to support their contention that the right to record police officers was not clearly established within the Fifth Circuit at the time of Buehler's arrests. *Gravolet v. Tassin*, No. 08-3646, 2009 WL 1565864 (E.D. La. June 2, 2009). In that case the plaintiff admitted to following a particular police officer who had previously arrested him and filming her from his car on three occasions. *Id.* at *1. The police officer obtained a temporary restraining order against the plaintiff because she feared his violent behavior. *Id.* The plaintiff was arrested for stalking by the police officer and two of her colleagues, and in a later civil suit against them, the plaintiff asserted that he had a constitutional right to videotape an officer on duty. *Id.* at *3. The court declined to find that such a right was clearly established at the time of the plaintiff's arrest, and held that the defendant

---

[5]The Third Circuit had previously recognized, however, that a right to record may exist. *See Gilles v. Davis*, 427 F.3d 197, 212 n.14 (3d Cir. 2005) ("[V]ideotaping or photographing the police in the performance of their duties on public property may be a protected activity.").

police officers were entitled to qualified immunity because there was probable cause to believe that the plaintiff was violating the antistalking statute. *Id.* at *4. *Gravolet* is distinguishable on several grounds. The plaintiff was the subject of an investigation due to his ongoing stalking activities and a decision was made to arrest him if the activity continued. Moreover, the decision is five years old, decided before *Glik* and *Alvarez*, fails to mention the Fifth Circuit decisions in *Enlow* and *Shillingford*, and addressed a motion for summary judgment. *Gravolet* therefore does not alter this Court's analysis.

If a person has the right to assemble in a public place, receive information on a matter of public concern, and make a record of that information for the purpose of disseminating that information, the ability to make photographic or video recording of that information is simply not a new right or a revolutionary expansion of a historical right. Instead, the photographic or video recording of public information is only a more modern and efficient method of exercising a clearly established right. In light of the existing Fifth Circuit precedent and the robust consensus among circuit courts of appeals, the Court concludes that the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of Buehler's arrests.

     *3.    Was the Officers' Conduct Reasonable?*

Having found that Buehler has alleged a violation of a clearly established right that existed at the time of his arrests, the Court turns to whether Buehler has alleged that the Officers' conduct was unreasonable in light of the clearly established law.

The facts pled in Buehler's Second Amended Complaint are set out in detail above and need not be repeated. As to each of the three arrests, Buehler has pled that he sought to record the Officers in public as they performed their official duties and did not interfere in the performance of

those duties. He further alleges that he was arrested as a result of these protected recording activities.

Defendants' contention to the contrary—that Buehler was not arrested in retaliation for exercising

his First Amendment Rights, but rather for violating the law—is a factual dispute that cannot be

resolved at the motion to dismiss stage. Accepting Buehler's factual allegations as true, a reasonable

officer could not have concluded that it was appropriate to retaliate against Buehler for exercising

his First Amendment right to record. *See Enlow*, 962 F.2d at 510 (holding that material facts

concerning reasonableness of defendant's conduct in arresting plaintiff precluded entitlement to

qualified immunity on First Amendment claim). The Court concludes that Buehler has pled

sufficient facts both to state a claim for relief and to defeat the qualified immunity defense. *See*

*Zapata*, 750 F.3d at 485. The Officers consequently are not entitled to qualified immunity from

Buehler's First Amendment claims.

**B.    False Arrest Claims**

*1.    Failure to State a Claim*

Defendants argue that Buehler's false arrest claims should be dismissed because he has failed

to plead that the prosecutions resulting from the allegedly false arrests "terminated in his favor."[6]

Clerk's Dkt. No. 18 at 8. That a prosecution terminated in the plaintiff's favor was formerly an

element of a Section 1983 malicious prosecution claim. *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir.

1994), *overruled by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc). As discussed

---

[6] The Court takes judicial notice of the public records related to the three arrests at issue in this suit, available on the Travis County Clerk's website, http://www.traviscountyclerk.org/eclerk/. *See Funk*, 631 F.3d at 783 (approving judicial notice of public records by district court reviewing motion to dismiss). Inquiry reveals that the charges filed against Buehler related to the arrests that are the subject of this litigation have since been dismissed. The Court finds that this fact is not subject to reasonable dispute because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See id.* (citing Fed. R. Evid. 201(b)).

more thoroughly below, a freestanding malicious prosecution claim is no longer a viable cause of action within the Fifth Circuit. *Castellano*, 352 F.3d at 945. Under the current state of the case law, there is no basis upon which to conclude that a plaintiff must plead that a prosecution terminated in his favor in order to state a claim for false arrest.

Instead, to state a claim for false arrest under Section 1983, the plaintiff must plead that he was arrested without probable cause to believe he committed an offense. *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* at 655–56 (citation and internal quotation marks omitted).

Buehler was arrested on January 1, 2012 for Resisting Arrest, Search, or Transportation. Under that provision of the Texas Penal Code, "[a] person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer . . . from effecting an arrest . . . of the actor or another by using force against the peace officer or another." Tex. Penal Code Ann. § 38.03. Notably absent from the Second Amended Complaint is any allegation that Buehler used any manner of force on Oborski, Snider, or any other individual, a necessary element of that offense. *See id.* (stating that resistance must be done "by *using force* against the peace officer or another" (emphasis added)). To the contrary, Buehler alleges that he backed away from Oborski and kept his arms open and down at his sides with his palms facing Oborski. Accepting as true Buehler's factual allegations, Oborski and Snider did not have probable cause to arrest Buehler on January 1, 2012 for Resisting Arrest, Search, or Transportation.

As to the arrests on August 26, 2012 and September 21, 2012, Buehler states that these

arrests were for Interference with Public Duties.  That section of the Texas Penal Code provides that "[a] person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law[.]"  Tex. Penal Code Ann. § 38.15(a)(1).  Buehler has alleged that on these dates, he was present on a public street filming police officers as they performed their official duties.  He has not alleged that he interfered with the officers performing their official duties in any way.  Regarding the September 21, 2012 arrest, Buehler alleges that he was more than 30 feet away from the officers and complied with Oborski's order to back further away.  The facts in the Second Amended Complaint, taken as true, do not support the conclusion that the Officers had probable cause to arrest Buehler for Interference with Public Duties on August 26, 2012 or September 21, 2012.

In their motion to dismiss, Defendants do not argue that the Officers had probable cause to arrest Buehler on any of the dates in question.  Even if Defendants had made such an argument, given that the Court must accept Buehler's factual allegations as true, the existence of probable cause would likely be a fact issue for determination at a later stage of this litigation.  *See Robertson*, 751 F.3d at 389 ("[O]ur task is not to weigh evidence at the motion to dismiss stage.").  Based on the factual allegations contained in the Second Amended Complaint, dismissal of Buehler's false arrest claims is not appropriate.

### 2.    *Qualified Immunity*

"The Fourth Amendment right to be free from false arrest—arrests without probable cause—was clearly established at the time of" Buehler's arrests.  *Club Retro, L.L.C. v Hilton*, 568 F.3d 181, 206 (5th Cir. 2009) (citations omitted); *see also Gerstein v. Pugh*, 420 U.S. 103, 111–12

(1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964))). Law enforcement officials who reasonably, but mistakenly, conclude that probable cause exists at the time of arrest are entitled to qualified immunity. *Club Retro*, 568 F.3d at 206. Thus, to survive a motion to dismiss on qualified immunity grounds, the plaintiff must allege "facts permitting an inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests." *Id.* at 207 (citations omitted).

The Officers argue that they are entitled to qualified immunity from Buehler's false arrest claims because the right to videotape police officers performing their duties was not clearly established at the time of Buehler's arrests. In the context of a false arrest claim, Defendants' argument states the constitutional question too narrowly. "The probable cause question is intertwined at least in part with the First Amendment inquiry but also includes additional factual issues." *Enlow*, 962 F.2d at 510. The inquiry therefore does not end with the question of whether the right to record police officers is protected under the First Amendment. Instead, the Officers must have believed reasonably, even if mistakenly, that Buehler's recording activities, and actions as he has pled them, gave the Officers probable cause to arrest him for Resisting Arrest, Search, or Transportation and for Interference with Public Duties.

Defendants do not argue in their motion to dismiss that the Officers reasonably but mistakenly believed they had probable cause to arrest Buehler on any of the dates in question. Even if such an argument had been made, the existence of a reasonable but mistaken belief that the Officers had probable cause would likely be a fact issue for determination at a later stage of this

24

litigation. *See Enlow*, 962 F.2d at 510 (holding that whether the defendant "acted reasonably in the face of the Fourth Amendment claim[] remains a question of fact," precluding summary judgment on qualified immunity grounds). The facts contained within the Second Amended Complaint do not support such an inference. Therefore, the Officers are not entitled to qualified immunity on the false arrest claims.

## C.   Remaining Federal Claims

### 1.   *Malicious Prosecution*

Buehler asserts claims for malicious prosecution stemming from his arrests. The Fifth Circuit has held that a freestanding Section 1983 claim based solely on malicious prosecution is not a viable cause of action. *Castellano*, 352 F.3d at 945. "Rather, the claimant must allege that officials violated specific constitutional rights in connection with a malicious prosecution." *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation and internal quotation marks omitted). Therefore, Buehler's freestanding claim of malicious prosecution under Section 1983 fails and should be dismissed. *See id.* at 812–13 (holding that the plaintiff's "attempt to assert a free-standing [Section] 1983 malicious prosecution claim fails as a matter of law").

### 2.   *Excessive Force*

Buehler also asserts an excessive force claim against Oborski and Snider related to the January 1, 2012 arrest. To state a claim for excessive force, a plaintiff must first allege that he was seized. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004); *see also Graham v. Connor*, 490 U.S. 386, 388 (1989). He must also plead "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Flores*, 381 F.3d at 396 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740

25

(5th Cir. 2000)). A significant injury is not required to state an excessive force claim, but the plaintiff must claim "to have suffered at least some form of injury." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (citation and internal quotation marks omitted); *see also Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). Physical injury is not required; psychological injuries may sustain an excessive force claim. *Flores*, 381 F.3d at 398.

Defendants contend that this claim should be dismissed because Buehler has failed to allege that he was injured in the process of the January 1, 2012 arrest. Buehler's Second Amended Complaint alleges that Oborski walked toward Buehler "aggressively," "demanded to know who Mr. Buehler thought he was," pushed Buehler in the chest, chuckled, accused Buehler of spitting on him, grabbed Buehler's arm, put Buehler into a choke hold, and forced Buehler to the ground. Clerk's Dkt. No. 52 at 5. The Second Amended Complaint further alleges that Snider put Buehler's "left arm in an arm lock, and began to apply pressure to the elbow as if [Snider] were trying to dislocate it." *Id.* at 6. Buehler's only reference to injury suffered during this incident is the conclusory allegation that Oborski and Snider "used excessive force against him causing him injuries." *Id.* at 20. The Second Amended Complaint does not elaborate in any way on the nature or extent of these alleged injuries.

Buehler responds that further discovery is necessary and evidence should be presented to the Court to determine whether the amount of force used by Oborski and Snider was excessive. Setting to one side the question of why Buehler would need discovery regarding his own injuries, Buehler's response fails to address in any way his pleading deficiency. As Defendants point out in their motion, Buehler not alleged "the slightest pain, bleeding, or any physical manifestation of injury . . . ." Clerk's Dkt. No. 18 at 8. Nor has he alleged any psychological harm. His conclusory

26

allegation of injuries is insufficient to state a claim for excessive force. This claim, accordingly, should be dismissed. *See Flores*, 391 F.3d at 397 ("A plaintiff alleging an excessive force violation must show that she has suffered 'at least some injury.'" (quoting *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993))).

### 3. Unlawful Search and Seizure

Buehler also asserts claims of unlawful search and seizure related to the August 26, 2012 and September 21, 2012 arrests. He contends that his camera was seized from him during these arrests, in violation of the Fourth and Fourteenth Amendments. Defendants' motion does not seek dismissal of these claims or address them whatsoever. Accordingly they will not be dismissed.

### D. Claims Against the City and Acevedo

Defendants' primary contention in the motion to dismiss is that Buehler has not alleged a constitutional violation. As a result, they argue, the City and Acevedo cannot be held liable under Section 1983. As discussed above, Plaintiff has properly alleged violations of his First and Fourth Amendment rights. The Court next turns to whether Buehler has adequately alleged that the City and Acevedo are liable under Section 1983 for the Officers' conduct.

As an initial matter, claims against Acevedo in his official capacity[7] should be dismissed as duplicative of those against the City. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, and official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 832–33 (S.D. Tex. 2011) (dismissing suit against police officers

---

[7]The Second Amended Complaint does not explicitly state the capacity in which Acevedo is being sued. The Court does not interpret the Second Amended Complaint to assert any claims against Acevedo in his individual capacity, and therefore only addresses the claims against Acevedo in his official capacity.

in their official capacities as duplicative of the claims against the city).

### 1.   *Failure to Establish a Policy, Train, and Supervise*

Ordinarily a municipality cannot be held liable for the actions of its employees on a respondeat superior theory. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Instead, a plaintiff seeking to impose liability on a municipality must identify a policy or custom that caused the plaintiff's injury. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). "[M]unicipal liability under [S]ection 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

Buehler alleges that the City, APD, and Acevedo had no established policy addressing how Austin police officers should proceed when being recorded by a private citizen. Alternatively, Buehler alleges that if such a policy did exist, APD and Acevedo failed to adequately train or supervise regarding the policy. Common to all three of these claims is the requirement that Defendants acted, or failed to act, with deliberate indifference. *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (noting that the official policy requirement may be met when the policymaker fails to affirmatively act, if such failure to act amounts to deliberate indifference); *Poole v. City of Shreveport*, 691 F.3d 624, 634 (5th Cir. 2012) ("Only where a municipality's failure to establish a policy in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under [Section] 1983." (citation and internal punctuation omitted)); *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (stating that one element of Section 1983 claim for failure to train or supervise is that "the failure to train or supervise amounts to deliberate indifference"

(citation and internal quotation marks omitted)) .

Defendants seek dismissal of these claims on the ground that Buehler's Second Amended Complaint fails to adequately allege deliberate indifference.[8] Deliberate indifference is "a stringent standard" that requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (citation and internal quotation marks omitted). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation and internal quotation marks omitted). To satisfy this requirement, a plaintiff usually must demonstrate a pattern of similar violations and a deliberate or conscious choice to endanger constitutional rights. *Id.* at 383.

Defendants argue that Buehler has failed to meet this deliberate indifference standard because he relies solely on his three arrests and "unsubstantiated complaints" regarding the Officers' conduct, which do not establish a pattern of constitutional violations. Clerk's Dkt. No. 18 at 13–14. Buehler's burden at the pleading stage is simply to allege that a pattern of violations occurred, not to prove that the violations occurred. *See Twombly*, 550 U.S. at 570; *Robertson*, 751 F.3d at 389 ("[O]ur task is not to weigh evidence at the motion to dismiss stage."). Buehler alleges that he was arrested on three occasions for essentially the same conduct: recording police officers in public as they performed their official duties. He further alleges that after his first arrest he personally informed Acevedo that his rights had been violated, and Acevedo assured him that an investigation into this violation would occur. Put another way, he has alleged that a city official was personally

---

[8]Defendants also seek dismissal of a claim for "wrongful breach of duty based on a failure to train or supervise" and a claim for liability based on hiring or training policies. Clerk's Dkt. No. 18 at 12–13. The Court does not read the Second Amended Complaint as asserting these claims, and therefore does not address these arguments.

aware that an officer arrested him for activity protected by the First Amendment, and that the same constitutional violation occurred on two more occasions, even after he made the city official personally aware of the conduct.

These allegations are sufficient to state a claim under the theory that the City, APD, and Acevedo failed to establish a policy, or alternatively, that these Defendants failed to adequately train or supervise the Officers if such a policy did exist. *See Brown v. Bryan County*, 219 F.3d 450, 463 (5th Cir. 2000) (concluding that evidence supported finding that official was deliberately indifferent when official had personal notice of the highly predictable consequences of not training particular officer); *Sims v. Adams*, 537 F.2d 829, 832 (5th Cir. 1976) ("[A] complaint alleging that a police supervisor has notice of past culpable conduct of his subordinates and has failed to prevent a recurrence of such misconduct states a [Section] 1983 claim."); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011) (recognizing the possibility that deliberate indifference can be shown by a single constitutional violation in a narrow range of circumstances). The motion to dismiss these claims is accordingly denied.

### 2.   *Ratification*

Buehler also claims that the City and Acevedo are liable for the Officers' conduct under a ratification theory. Buehler alleges that APD and Acedvedo "knew of each of these violations, examined each of the violations pursuant to Complaints filed by Mr. Buehler, and yet took no action to remedy the violations or prevent further civil rights violations from occurring." Clerk's Dkt. No. 52 at 18. Defendants argue this claim should be dismissed because the ratification theory does not apply to the conduct at issue in this suit.

The ratification theory, applied by the Fifth Circuit in *Grandstaff v. City of Borger*, 767 F.2d

30

161 (5th Cir. 1985), has been limited to "extreme factual situations." *Snyder v. Trepagnier*, 142 F.3d

791, 797–98 (5th Cir. 1998) (quoting *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986))

(internal quotation marks omitted). In *Grandstaff*, the Fifth Circuit upheld a jury verdict against a

city based on a custom of reckless disregard for human life prevalent among the city's police

officers. *Grandstaff*, 767 F.2d at 170–72. The officers had "poured" gunfire into a slow-moving

truck "without awaiting any hostile act or sound," shooting and killing an innocent man. *Id.* at 168.

The Court agrees with Defendants that such extreme facts are not presented in the instance case. *See*

*Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) (concluding that knee strike used

by officer when plaintiff was in full compliance with all police orders, offering no resistance, and

handcuffed did not rise to extreme level); *Snyder*, 142 F.3d at 798 (refusing to find ratification where

officer shot fleeing suspect in the back). The claims bought under a ratification theory should thus

be dismissed.

### E.    State-Law Claims

#### *1.    Texas Constitutional Claims*

Buehler asserts claims for violations of the free speech, search and seizure, takings, due

process, and assembly sections of the Bill of Rights to the Texas Constitution. *See* Tex. Const. art.

1, §§ 8, 9, 17, 19, 27. Defendants argue that these claims should be dismissed because no private

right of action for damages exists for these alleged violations. In response to the motion to dismiss,

Buehler explains that he seeks damages only for the alleged violation of the takings clause, and that

he seeks equitable relief for the remaining alleged Texas constitutional violations.

The Texas Supreme Court has held that the Bill of Rights to the Texas Constitution creates

a private right for damages only if the language of the specific provision involved clearly implies

31

such a right. *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004). The Texas Supreme Court

has found that the takings section of the Bill of Rights implies a private right of action for damages

because it prohibits takings "without adequate compensation." *Id.* (emphasis, citation, and internal

quotation marks omitted); *see also* Tex. Const. art. 1, § 17. The Texas Supreme Court has also

found that the free speech and assembly sections give rise only to a private right of action for

equitable relief by declaring simply that violations of those sections "shall be void." *Brown*, 156

S.W.3d at 563 (emphasis, citation, and internal quotation marks omitted); *see also* Tex. Const. art.

1, §§ 8, 27, 29.

Buehler also asserts violations of the search and seizure and due process sections. *See* Tex.

Const. art. 1, §§ 9, 19. These sections do not mention compensation or damages in any respect, and

therefore do not provide a private right of action for damages. *Id.*; *see also Brown*, 156 S.W.3d at

563. Nevertheless, under the Texas Constitution, any action taken in violation of the search and

seizure or due process sections of the Bill of Rights "shall be void." Tex. Const. art. 1, § 29. As

a result, these two sections also give rise to a private right of action for equitable relief. *See Brown*,

156 S.W.3d at 563.

The Court first turns to Buehler's claims for damages under the Bill of Rights to the Texas

Constitution. In light of the foregoing, the only viable damages claim he has alleged is for the taking

of his cameras. In order to be compensated for a taking under the Bill of Rights to the Texas

Constitution, the taking must be "for public use." Tex. Const. art. 1, § 17; *City of Beaumont v.*

*Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995). "Public use" is defined as a use by which "the public

obtains some definite right or use in the undertaking to which the property is devoted." *City of*

*Austin v. Whittington*, 384 S.W.3d 766, 779 (Tex. 2012). Buehler has not alleged that his cameras

were taken for such a public use, and therefore has failed to state a takings claim. Additionally, his remaining constitutional violation claims, to the extent they seek damages, must also be dismissed.

As to Buehler's claims for equitable relief, the relief section of the Second Amended Complaint seeks "[a]ll such other relief to which the plaintiff is entitled." Clerk's Dkt. No. 52 at 27. Defendants argue that this request is insufficient to survive the motion to dismiss, but fail to cite any case law in support of their position. Buehler's burden at the pleading stage is to plead only those specific facts that entitle him to relief. *See Twombly*, 550 U.S. at 570. This Court does not read *Twombly* or *Iqbal* to require a plaintiff to plead with specificity the precise relief to which he is entitled. Buehler may continue to seek equitable relief for the alleged violations of the free speech, search and seizure, due process, and assembly sections of the Bill of Rights to the Texas Constitution.

### 2. Common Law Tort Claims

Buehler asserts claims of conversion against Berry and Johnson for the taking of his cameras during the August 26, 2012 and September 21, 2012 arrests and against all of the Officers for false arrest and imprisonment related to each arrest that is the subject of this lawsuit. Defendants argue that these state-law tort claims should be dismissed because "a governmental unit" is immune from liability for intentional torts under Texas law. Clerk's Dkt. No. 18 at 4–5. Buehler responds that the state-law tort claims are not being pursued against the governmental entities named as defendants in this lawsuit, but rather are being pursued only against the Officers in their individual capacities as alternative theories of relief.

"The Texas Tort Claims Act provides a limited waiver of immunity for certain suits against governmental entities and caps recoverable damages." *Mission Consol. Indep. Sch. Dist. v. Garcia*,

253 S.W.3d 653, 655 (Tex. 2008). The Texas Tort Claims Act applies only to the liability of a governmental unit. *See* Tex. Civ. Prac. & Rem. Code §§ 101.001(3), 101.021, 101.026 (defining "Government unit," providing for governmental liability for property damage and personal injury, and stating that the Texas Tort Claims Act does not affect individual immunity, respectively). To the extent the Second Amended Complaint can be read to assert state-law tort claims against the governmental entities, those claims must be dismissed.

The Texas Tort Claims Act, however, does not provide grounds upon which to dismiss the state-law claims against the individuals. *See Kelemen v. Elliott*, 260 S.W.3d 518, 523 (Tex. App.—Hous. [1st Dist.] 2008, no pet.) (denying motion to dismiss state-law tort claims under Texas Tort Claims Act brought against employee in individual capacity); *see also Brock v. City of Refugio*, No. V-11-36, 2012 WL 360048, at *3–4 (S.D. Tex. Feb. 1, 2012) (same). The state-law claims against the Officers in their individual capacities therefore remain.

### 3. *Official Immunity*

Defendants also argue that they are entitled to official immunity for the Texas state-law claims. Under Texas law, official immunity is an affirmative defense, and the defendant has the burden of establishing each element. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). "Government employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Id.* (citations omitted). Defendants fail to address any of these elements in the motion to dismiss.

With respect to the second element, "to establish good faith, an officer must show that 'a reasonably prudent officer, under the same or similar circumstances, could have believed that his

34

conduct was justified based on the information he possessed when the conduct occurred.'" *Ramirez v. Martinez*, 716 F.3d 369, 380 (5th Cir. 2013) (quoting *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002)). Good faith is measured "against a standard of objective legal reasonableness, without regard to the officer's subjective state of mind." *Id.* (citation and internal quotation marks omitted). "Texas law of official immunity is substantially the same as federal qualified immunity law." *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997).

The factual basis for Buehler's conversion and false arrest and imprisonment claims is the same as the basis for his Section 1983 claims. For the reasons discussed above, a reasonable officer acting in good faith could not have concluded that probable cause existed to arrest Buehler. Because the Officers were not entitled to qualified immunity from Buehler's Section 1983 false arrest claim, they are not entitled to official immunity from Buehler's state-law false arrest and imprisonment claim *Cf. Ramirez*, 716 F.3d at 380 (concluding that deputy was entitled to official immunity on false arrest and imprisonment claim when deputy was entitled to qualified immunity from Section 1983 false arrest claim based on same facts).

Defendants have not argued that they are entitled to qualified immunity from Buehler's unlawful search and seizure claims, and have failed to meet their burden of setting forth the elements that would entitle them to official immunity from Buehler's conversion claims. *Cf. Wren*, 130 F.3d at 1160 (granting official immunity on conversion claim when defendants were entitled to qualified immunity on plaintiffs' Section 1983 unreasonable seizure claim based on same set of facts). The Officers are therefore not entitled to official immunity from Buehler's state-law tort claims.

35

## IV.   CONCLUSION

For foregoing reasons, Defendants' Rule 12(b)(1)&(6) Motion to Dismiss (Clerk's Dkt. No. 18) is **GRANTED IN PART** and **DENIED IN PART**.  The following claims remain in this suit:

(1) Section 1983 claims for violations of the First Amendment, false arrest, and unlawful search and seizure against the Officers in their individual capacities;

(2) Claims for failure to establish a policy, failure to train, and failure to supervise asserted against the City;

(3) Claims for equitable relief brought under Sections 8, 9, 19, and 27 of the Bill of Rights to the Texas Constitution against the City and the Officers in their individual capacities; and

(4) State-law tort claims for conversion and false arrest and imprisonment against the Officers in their individual capacities.

The rest of Buehler's claims are **DISMISSED WITHOUT PREJUDICE**.

**SIGNED** on July 24, 2014.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE
Presiding under 28 U.S.C. § 636(c)