c T J

NORTHERN DISTRICT OF TEXAS
FILED

MAR 1 0 2017

CLERK, U.S. DISTRICT COURT
By_____
Deputy

4:15-cv-824-A

**REVISED February 27, 2017**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-10312

United States Court of Appeals
Fifth Circuit

**FILED**

February 16, 2017

Lyle W. Cayce
Clerk

PHILLIP TURNER,

> Plaintiff - Appellant

v.

LIEUTENANT DRIVER, in his individual capacity; OFFICER GRINALDS, Badge Number 3825, in his individual capacity; OFFICER DYESS, Badge Number 2586, in his individual capacity,

> Defendants - Appellees

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before WIENER, CLEMENT, and HIGGINSON, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Phillip Turner was video recording a Fort Worth police station from a public sidewalk across the street when Defendants-Appellees Officers Grinalds and Dyess approached him and asked him for identification. Turner refused to identify himself, and the officers ultimately handcuffed him and placed him in the back of a patrol car. The officers' supervisor, Defendant-Appellee Lieutenant Driver, arrived on scene and, after Driver checked with Grinalds and Dyess and talked with Turner, the officers

No. 16-10312

released Turner. He filed suit against all three officers and the City of Fort Worth under 42 U.S.C. § 1983, alleging violations of his First and Fourth Amendment rights. Each officer filed a motion to dismiss, insisting that he was entitled to qualified immunity on Turner's claims. The district court granted the officers' motions, concluding that they were entitled to qualified immunity on all of Turner's claims against them. Turner timely appealed. We affirm in part and reverse and remand in part.

I.
FACTS AND PROCEEDINGS

A.    Facts[1]

In September 2015, Turner videotaped the Fort Worth Police Station from a public sidewalk across the street from the station. He was unarmed. While videotaping, Turner observed Fort Worth Police Officers Grinalds and Dyess pull up in a patrol car in front of the station, get out, and approach him.

Grinalds asked Turner, "How's it going, man? Got your ID with you?" Turner continued videotaping, and Grinalds repeatedly asked Turner if he had any identification. Turner asked the officers whether he was being detained, and Grinalds responded that Turner was being detained for investigation and that the officers were concerned about who was walking around with a video camera. Turner asked for which crime he was being detained, and Grinalds replied, "I didn't say you committed a crime." Grinalds elaborated, "We have the right and authority to know who's walking around our facilities."

Grinalds again asked for Turner's identification, and Turner asked Grinalds, "What happens if I don't ID myself?" Grinalds replied, "We'll cross that bridge when we come to it." Grinalds continued to request Turner's identification, which Turner refused to provide. Grinalds and Dyess then

---

[1] All facts derive from the plaintiff's amended complaint and, in this posture, are taken as true. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012).

No. 16-10312

"suddenly and without warning" handcuffed Turner and took his video camera from him, and Grinalds said, "This is what happens when you don't ID yourself."

Turner requested to see a supervisor. Grinalds continued to ask for Turner's ID and told him that he would be fingerprinted so the officers could learn his identity. The officers placed the handcuffed Turner in the back of their patrol car and "left him there to sweat for a while with the windows rolled up." Turner alleges that no air was getting to the back seat and that he banged on the door so the officers would roll down the windows.

Lieutenant Driver approached Grinalds and Dyess, and they "seemingly ignored Mr. Turner." The three officers then rolled down the windows of the patrol car and found Turner lying down in the back seat. Lieutenant Driver identified himself as the commander. Driver asked Turner what he was doing, and Turner explained that he was taking pictures from the sidewalk across the street. Driver asked Turner for his ID, and Turner told the lieutenant that he did not have to identify himself because he had not been lawfully arrested and that he chose not to provide his identification. Driver responded, "You're right."

Driver walked away and talked with the officers, then returned to the patrol car and talked with Turner. Turner said, "You guys need to let me go because I haven't done anything wrong." Driver again walked away from the car, talked on the phone, and spoke further with the officers. They returned to the car and took Turner out of the back seat. Driver "lectur[ed]" Turner, and the officers finally released him and returned his camera to him.

B.    Proceedings

In October 2015, Turner filed suit in the Northern District of Texas against Driver, Grinalds, and Dyess (collectively, "defendants") in their individual capacities. Each officer filed a motion to dismiss under Rule 12(b)(6)

Case: 16-10312    Document: 00513906538    Page: 4    Date Filed: 03/10/2017
Case 4:15-cv-00824-A   Document 42   Filed 03/10/17   Page 4 of 26   PageID 376

No. 16-10312

of the Federal Rules of Civil Procedure. Turner filed an amended complaint in January 2016, adding the City of Fort Worth as a defendant.[2] Turner brought claims under 42 U.S.C. § 1983 against all defendants, alleging that they violated his First, Fourth, and Fourteenth Amendment rights.[3] Turner sought compensatory damages, punitive damages, attorneys fees and costs, and declaratory judgment that the defendants had violated his constitutional rights.

The three officers filed motions to dismiss Turner's amended complaint. The district court granted the motions to dismiss on the basis of qualified immunity. The court reasoned that Turner failed to meet his burden of showing that the defendants were not entitled to qualified immunity because he failed to show that their actions violated any of his clearly established statutory or constitutional rights or that their actions were objectively unreasonable.[4] Turner timely appealed.

## II.
### STANDARD OF REVIEW

We review a district court's grant of a motion to dismiss based on qualified immunity de novo.[5] We accept all well-pleaded facts as true and view them in the light most favorable to the non-movant.[6] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

---

[2] Defendant City of Fort Worth did not file a motion to dismiss and is not a party to this appeal.

[3] Although Turner alleged in the district court that the defendants violated his Fourteenth Amendment rights, he has not raised an issue on appeal regarding a Fourteenth Amendment claim.

[4] The district court's analysis rested entirely on its determination that a First Amendment right to videotape police activity was not clearly established.

[5] *Whitley v. Hanna*, 726 F.3d 631, 637 (5th Cir. 2013).

[6] *Id.*

No. 16-10312

to 'state a claim to relief that is plausible on its face.'"[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[9] Although a complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level."[10] "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[11]

## III.
### ANALYSIS

"To state a claim under 42 U.S.C. § 1983, a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law."[12] "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."[13] When a defendant raises a qualified immunity defense, the plaintiff has the burden of demonstrating the inapplicability of that defense.[14] To meet this burden, the plaintiff must show "(1) that the official violated a statutory or constitutional

---

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[8] *Id.*

[9] *Id.*

[10] *Twombly*, 550 U.S. at 555.

[11] *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).

[12] *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005).

[13] *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

[14] *Atteberry*, 430 F.3d at 253.

No. 16-10312

right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[15] Like the district court, we have the discretion to decide which prong of the qualified immunity analysis to address first.[16]

A.    First Amendment

The district court concluded that the defendants were entitled to qualified immunity on Turner's First Amendment claim because he failed to demonstrate that the defendants' actions violated a clearly established right or that their actions were objectively unreasonable. In particular, the district court ruled that a First Amendment right to video record police activity was not clearly established. The district court's analysis rested on the second, "clearly established," prong, so we begin there.

1. Whether the Right Was Clearly Established in September 2015

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[17] Thus, the right must already be clearly established "at the time of the challenged conduct."[18] When considering whether a defendant is entitled to qualified immunity, the court "must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].'"[19] "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity."[20] "Where

---

[15] *Whitley*, 726 F.3d at 638 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

[16] *Morgan*, 659 F.3d at 371.

[17] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[18] *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *al-Kidd*, 563 U.S. at 735).

[19] *Morgan*, 659 F.3d at 371 (alteration in original) (quoting *al-Kidd*, 563 U.S. at 741).

[20] *Id.* at 371–72 (internal quotation marks omitted).

No. 16-10312

no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established. This is true even when the circuit split developed *after* the events in question."[21] As the Supreme Court has explained, "[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."[22]

At the time in question, neither the Supreme Court nor this court had determined whether First Amendment protection extends to the recording or filming of police.[23] Although Turner insists, as some district courts in this circuit have concluded, that First Amendment protection extends to the video recording of police activity in light of general First Amendment principles,[24] the Supreme Court has "repeatedly" instructed courts "not to define clearly established law at a high level of generality": "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."[25] Thus, Turner's reliance on decisions that "clarified that [First Amendment] protections . . . extend[] to gathering information" does not demonstrate whether the specific act at issue here—video recording the police or a police station—was clearly established.[26]

---

[21] *Id.* at 372 (citation omitted).

[22] *Wilson v. Layne*, 526 U.S. 603, 618 (1999); *see also Morgan*, 659 F.3d at 372.

[23] Even intracircuit decisions in which courts determine that the right to record police activities is clearly established note that there is no controlling authority on this specific issue. *See, e.g., Turner v. City of Round Rock*, No. 15-CV-939-RP, ECF No. 43 (W.D. Tex. May 25, 2016) ("The Fifth Circuit apparently has not explicitly noted a right to film police or outlined the contours of such a right.").

[24] *See, e.g., id.; Buehler v. City of Austin*, No. 1:13-CV-1100-ML, ECF No. 54 (W.D. Tex. July 24, 2014).

[25] *al-Kidd*, 563 U.S. at 742.

[26] Turner relies on cases such as *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952), *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. Unit A Jan. 1981), and *In re Express-News*

No. 16-10312

The district court stated that circuit courts "are split as to whether or not there is a clearly established First Amendment right to record the public activities of police." The circuit courts are not split, however, on whether the right exists. The First and Eleventh Circuits have held that the First Amendment protects the rights of individuals to videotape police officers performing their duties.[27] In *American Civil Liberties Union v. Alvarez*, the Seventh Circuit explained that the First Amendment protects the audio recording of the police and concluded that an Illinois wiretapping statute, which criminalized the audio recording of police officers, merited heightened First Amendment scrutiny because of its burdens on First Amendment rights.[28] No circuit has held that the First Amendment protection does *not* extend to the video recording of police activity, although several circuit courts have explained that the law in their respective circuits is not clearly

---

*Corp.*, 695 F.2d 807 (5th Cir. 1982), to support his assertion that the right to record police is clearly established under Supreme Court and Fifth Circuit precedent. None of the cases on which Turner relies, however, taken individually or collectively, demonstrates such a clearly established right. For example, in *Joseph Burstyn*, the Supreme Court limited its analysis to whether *motion pictures* fall within the scope of the First Amendment. *See Joseph Burstyn*, 343 U.S. at 501–02. *Shillingford* did not involve any First Amendment challenge. *See Shillingford*, 634 F.2d at 264–66. And *In re Express-News* pertained to a news reporter's ability to interview jurors after they serve on a criminal trial. *In re Express-News*, 695 F.2d 807.

[27] *See, e.g., Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("Recognizing that it is firmly established that the First Amendment protects 'a range of conduct' surrounding the gathering and dissemination of information, we held [in *Glik v. Cunniffe*] that the Constitution protects the right of individuals to videotape police officers performing their duties in public."); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("The First Amendment issue here is, as the parties frame it, fairly narrow: is there a constitutionally protected right to videotape police carrying out their duties in public? Basic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir.), *cert. denied*, 531 U.S. 978 (2000) (holding that there exists "a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct").

[28] *Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583, 595–602 (7th Cir. 2012).

No. 16-10312

established while refraining from determining whether there is a First Amendment right to record the police.[29]

We cannot say, however, that "existing precedent . . . placed the . . .constitutional question *beyond debate*" when Turner recorded the police station.[30] Neither does it seem that the law "so clearly and unambiguously prohibited [the officers'] conduct that *'every* reasonable official would understand that what he is doing violates [the law].'"[31] In light of the absence of controlling authority and the dearth of even persuasive authority, there was no clearly established First Amendment right to record the police at the time of Turner's activities. All three officers are entitled to qualified immunity on Turner's First Amendment claim.

2. Whether the Right Is Clearly Established Henceforth

Although the right was not clearly established at the time of Turner's activities, whether such a right exists and is protected by the First Amendment presents a separate and distinct question.[32] Because the issue continues to arise in the qualified immunity context,[33] we now proceed to determine it for

---

[29] *See, e.g., Kelly v. Borough of Carlisle,* 622 F.3d 248, 261–62 (3d Cir. 2010) (holding that a First Amendment right to videotape police officers during traffic stops was not clearly established); *Szymecki v. Houck,* 353 F. App'x 852, 853 (4th Cir. 2009) (per curiam) (noting that a First Amendment right to record police activities on public property was not clearly established); *McCormick v. City of Lawrence, Kan.,* 130 F. App'x 987, 988–89 (10th Cir. 2005) (explaining that it was not clearly established that police violated the First Amendment by destroying recordings of police activity at roadside sobriety checkpoints).

[30] *Morgan,* 659 F.3d at 372 (quoting *al-Kidd,* 563 U.S. at 741).

[31] *Id.* at 371 (second alteration in original) (quoting *al-Kidd,* 563 U.S. at 741).

[32] *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

[33] *Compare Basler v. Barron,* No. 15-CV-2254, 2016 WL 1672573, at *3 (S.D. Tex. Apr. 27, 2016) ("It is well established that the gathering of information about government affairs or matters of public concern—including recording police activity—is protected by the First Amendment."), *and Buehler*—2015 WL 737031, at *9 ("In light of the existing Fifth Circuit precedent and the robust consensus among circuit courts of appeals, the Court concludes that the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of Buehler's arrests."), *aff'd on other grounds,* 824 F.3d 548

No. 16-10312

the future. We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions.

The First Amendment protects freedom of speech and freedom of the press.[34] But "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."[35] News-gathering, for example, "is entitled to first amendment protection, for 'without some protection for seeking out the news, freedom of the press could be eviscerated,'"[36] even though this right is not absolute.[37] The Supreme Court has also recognized a First Amendment right to "receive information and ideas,"[38] and there is "an undoubted right to gather news from any source by

---

(5th Cir. 2016); *Turner*, No. 15-CV-939-RP, ECF No. 43 at *11 ("The Fifth Circuit apparently has not explicitly noted a right to film police or outlined the contours of such a right. However, '[t]he First Amendment protects a private citizen's right to assemble in a public forum, receive information on a matter of public concern—such as police officers performing their official duties—and to record that information for the purpose of conveying that information." (alteration in original) (quoting *Buehler*, 2015 WL 737031, at *7)), *with Cadena v. Ray*, No. 5:15-CV-552-DAE, 2016 WL 6330438, at *3 n.5 (W.D. Tex. Oct. 27, 2016) ("Since Cadena fails to otherwise show the existence of a clearly established right to videotape police operations, he has failed to meet his burden to overcome the assertion of qualified immunity."), *and Gravolet v. Tassin*, No. 08-CV-3646, 2009 WL 1565864, at *3 (E.D. La. June 2, 2009) ("Even assuming that the plaintiff had the 'clearly established right' to videotape Tassin while on duty, that right does not render the stalking statute inapplicable nor does a video camera immunize the plaintiff from such a charge.").

[34] U.S. CONST. amend. I.

[35] *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

[36] *In re Express-News*, 695 F.2d at 808 (quoting *Branzburg v. Hayes*, 408 U.S. 655, 681 (1972)).

[37] *See Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996).

[38] *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (internal quotation marks omitted).

No. 16-10312

means within the law."[39] Furthermore, the Supreme Court has long recognized that the First Amendment protects film.[40] A corollary to this principle is that the First Amendment protects the act of making film, as "there is no fixed First Amendment line between the act of creating speech and the speech itself."[41] Indeed, the Supreme Court has never "drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded. Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation."[42]

In addition to the First Amendment's protection of the broader right to film, the principles underlying the First Amendment support the particular right to film the police. "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of

---

[39] *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (internal quotation marks omitted).

[40] *See e.g.*, *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688 (1959) ("What New York has done, therefore, is to prevent the exhibition of a motion picture because that picture advocates an idea—that adultery under certain circumstances may be proper behavior. Yet the First Amendment's basic guarantee is of freedom to advocate ideas. The State, quite simply, has thus struck at the very heart of constitutionally protected liberty."); *Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589 (1954) (Douglas, J., concurring) ("Motion pictures are of course a different medium of expression than the public speech, the radio, the stage, the novel, or the magazine. But the First Amendment draws no distinction between the various methods of communicating ideas."); *Joseph Burstyn*, 343 U.S. at 502 ("[W]e conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments.").

[41] *Alvarez*, 679 F.3d at 596 (citing *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010)); *see also id.* at 595 ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected . . . .").

[42] *Anderson*, 621 F.3d at 1061–62.

No. 16-10312

governmental affairs."[43] To be sure, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."[44] Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy. Filming the police also frequently helps officers; for example, a citizen's recording might corroborate a probable cause finding or might even exonerate an officer charged with wrongdoing. As one court explained:

> Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs." Moreover, as the [Supreme] Court has noted, "[f]reedom of expression has particular significance with respect to government because '[i]t is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression.'" This is particularly true of law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties. Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally.[45]

Protecting the right to film the police promotes First Amendment principles.

We agree with every circuit that has ruled on this question: Each has concluded that the First Amendment protects the right to record the police.[46]

---

[43] *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

[44] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (citation omitted).

[45] *Glik*, 655 F.3d at 82–83 (citations omitted).

[46] *See Alvarez*, 679 F.3d at 595–96; *Glik*, 655 F.3d at 82, 85; *Smith*, 212 F.3d at 1333; *see also Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

No. 16-10312

As the First Circuit explained, "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [basic First Amendment] principles."[47] This right, however, "is not without limitations."[48] Like all speech,[49] filming the police "may be subject to reasonable time, place, and manner restrictions."[50] In this case, however, we need not decide which specific time, place, and manner restrictions would be reasonable.[51] Nonetheless, we note that when police departments or officers adopt time, place, and manner restrictions, those restrictions must be "narrowly tailored to serve a significant governmental interest."[52] That said, to be constitutionally permissible, a time, place, and manner restriction "need not be the least restrictive or least intrusive means of serving the government's interests."[53]

B.    Fourth Amendment

Turner also insists that he has asserted plausible claims under § 1983, to which the defendants are not immune, *viz.*, that the officers violated his Fourth Amendment rights to be free from (1) detention absent reasonable suspicion and (2) warrantless arrest absent probable cause. Because Lieutenant Driver did not arrive on scene until Officers Grinalds and Dyess

---

[47] *Glik*, 655 F.3d at 82.

[48] *Id.* at 84.

[49] *See, e.g., Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 535–36 (1980) (discussing history of time, place, and manner restrictions).

[50] *Glik*, 655 F.3d at 84; *see, e.g., Smith*, 212 F.3d at 1333. "Importantly, an individual's exercise of her First Amendment right to film police activity carried out in public . . . necessarily remains unfettered unless and until a reasonable restriction is imposed or in place." *Gericke*, 753 F.3d at 8.

[51] *See Glik*, 655 F.3d at 84 ("We have no occasion to explore those limitations here, however.").

[52] *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

[53] *Id.* at 2535 (internal quotation marks omitted).

No. 16-10312

had already handcuffed Turner and placed him in the back of the patrol car, we first analyze whether Grinalds and Dyess are entitled to qualified immunity on Turner's Fourth Amendment claims.

### 1. Officers Grinalds and Dyess

#### a. Detention

Turner alleges that Grinalds and Dyess's initial questioning of him violated his Fourth Amendment right to be free from detention absent reasonable suspicion. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' . . . ."[54] The Supreme Court has "said repeatedly that [when determining whether officers had reasonable suspicion, courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[55] Courts "consider only the 'information available to the officer[s] at the time of the decision to stop a person.'"[56]

Even if we assume *arguendo* that Grinalds and Dyess violated Turner's Fourth Amendments rights by detaining him without reasonable suspicion, we cannot say that this detention was objectively unreasonable in light of clearly established law.[57] An individual's right to be free from detention absent

---

[54] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). This type of stop is also known as a "Terry stop."

[55] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[56] *Carroll v. Ellington*, 800 F.3d 154, 171 (5th Cir. 2015) (alteration in original) (quoting *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992)), *cert. denied*, 137 S. Ct. 492 (2016).

[57] *Gonzalez v. Huerta*, 826 F.3d 854, 857 n.4 (5th Cir. 2016) ("We may proceed directly to the second prong of the qualified immunity analysis without explicitly ruling on the first." (citing *Pearson*, 555 U.S. at 227)), *cert. denied*, 2017 WL 69303 (U.S. 2017).

No. 16-10312

reasonable suspicion was clearly established well before the actions giving rise to this case.[58] "But this general claim—that a seizure under the Fourth Amendment must be based on reasonable suspicion—is precisely the type of 'general proposition' that the Supreme Court has rejected."[59] Whether a right was clearly established at the time the defendant acted "requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident."[60] Courts "must ask whether the law so clearly and unambiguously prohibited his conduct that *'every* reasonable official would understand that what he is doing violates [the law].'"[61]

"The Fourth Amendment is concerned with ensuring that the scope of a given detention is reasonable under the totality of the circumstances."[62] Turner alleges that, when Grinalds and Dyess approached him, he was videotaping the police station while walking on the sidewalk across the street during midday. Nothing in the amended complaint suggests that Turner was videotaping an arrest, a traffic stop, or any other action or activity being performed by the police in the course of their duties. On the contrary, Turner's complaint states that he was filming only "the routine activities at the Fort Worth Police Department building." On appeal, Grinalds and Dyess reference several attacks on police officers and police stations, including those in Dallas

---

[58] *See* U.S. CONST. amend. IV; *Ibarra v. Harris Cty. Tex.*, 243 F. App'x 830, 833 (5th Cir. 2007) (per curiam) ("The law is clearly established that a detention is objectively unreasonable if the police officers lacks reasonable suspicion to believe that the person is engaged in criminal activity . . . ." (citing *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

[59] *Gonzalez*, 826 F.3d at 857–58 (citing *al-Kidd*, 563 U.S. 731); *see Wilson*, 526 U.S. at 615 ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. . . . However, . . . the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.").

[60] *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004).

[61] *Morgan*, 659 F.3d at 371 (alteration in original) (quoting *al-Kidd*, 563 U.S. at 741).

[62] *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc).

No. 16-10312

and Austin, and the resulting increase of security at police stations.[63] "[I]t [is] appropriate for the police to take into account the location of the suspicious conduct and the degree of the potential danger being investigated. What is not suspicious in one location may be highly suspicious in another."[64] Turner's filming in front of the police station "potentially threatened security procedures at a location where order was paramount."[65] An objectively reasonable person in Grinalds's or Dyess's position could have suspected that Turner was casing the station for an attack, stalking an officer, or otherwise preparing for criminal activity, and thus could have found Turner's filming of the "routine activities" of the station sufficiently suspicious to warrant questioning and a brief detention. The officers' detention of Turner under these circumstances was not "plainly incompetent" or a knowing violation of the law.[66]

---

[63] *See, e.g.,* Jason Hanna and Joe Sutton, *Dallas Police HQ Shooting: Suspect James Boulware Killed During Standoff,* CNN (June 13, 2015), http://www.cnn.com/2015/06/13/us/dallas-police-headquarters-shooting ("A man unleashed a barrage of gunfire on Dallas' police headquarters and planted explosives outside the building early Saturday . . . ."); *Austin Gunman Dead after Downtown Shooting Rampage,* KXAN (Nov. 28, 2014), http://kxan.com/2014/11/28/austin-police-shut-down-city-streets-for-active-shooter-investigation/ ("A gunman opened fire at four different buildings, including [Austin Police Department] headquarters . . . . An officer about to get off duty saw the suspect near [the police department] HQ and opened fire on the suspect who fell to the ground.").

"Specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy may be judicially noticed." *Weaver v. United States,* 298 F.2d 496, 498 (5th Cir. 1962); *see also United States v. Ramos,* 629 F.3d 60, 66–68 (1st Cir. 2010) (concluding that the officers had reasonable suspicion that criminal activity was afoot under the totality of the circumstances, including that the officers "were particularly alert to the risk of attacks on public transit systems in light of the coordinated terrorist attacks on Madrid commuter rail trains . . . less than three months earlier").

[64] *Ramos,* 629 F.3d at 66–67.

[65] *Mocek v. City of Albuquerque,* 813 F.3d 912, 924 (10th Cir. 2015).

[66] *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

No. 16-10312

We cannot say that, when viewed in light of the totality of the
circumstances, Grinalds and Dyess's initial questioning or detention of Turner,
before he was handcuffed, was objectively unreasonable in light of clearly
established law. Accordingly, Grinalds and Dyess are entitled to qualified
immunity on Turner's claim that they violated his Fourth Amendment right to
be free from detention absent reasonable suspicion.[67]

b. Arrest

Turner also contends that the officers violated his Fourth Amendment
right to be free from unlawful arrest. The parties dispute whether Turner's
detention amounted to an arrest. "A seizure rises to the level of an arrest only
if 'a reasonable person in the suspect's position would have understood the
situation to constitute a restraint on freedom of movement of the degree which
the law associates with formal arrest.'"[68] The "reasonable person" is one who
is "neither guilty of criminal conduct and thus overly apprehensive nor
insensitive to the seriousness of the circumstances."[69] When determining
whether an investigative stop amounts to an arrest, "[t]he relevant inquiry is
always one of reasonableness under the circumstances," which must be
considered on a case-by-case basis.[70] "[U]sing some force on a suspect, pointing
a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing
a suspect—whether singly or in combination—do not automatically convert an

---

[67] *See Carroll*, 800 F.3d at 171 (concluding that, because the plaintiffs "have not shown
that [the defendant] was objectively unreasonable in light of clearly established law in
initially attempting to detain [the deceased] for investigatory questioning," the defendant
was entitled to qualified immunity).

[68] *Id.* at 170 (quoting *United States v. Corral-Franco*, 848 F.2d 536, 540 (5th Cir.
1988)).

[69] *Corral-Franco*, 848 F.2d at 540 (quoting *United States v. Bengivenga*, 845 F.2d 593
(5th Cir. 1988)).

[70] *United States v. Sanders*, 994 F.2d 200, 206–07 (5th Cir. 1993).

No. 16-10312

investigatory detention into an arrest requiring probable cause."[71] But, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."[72]

Turner alleges that he was handcuffed and placed in the back of the patrol car, where the officers left him "for a while." There is "no rigid time limitation" on investigative stops, but "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."[73] Although Turner has not alleged the length of time that he was detained in the back seat of the patrol car, Grinalds's and Dyess's actions—handcuffing Turner and placing him in the patrol car—were disproportionate to any potential threat that Turner posed or to the investigative needs of the officers.[74] Based on the

---

[71] *Id.* at 206.

[72] *Florida v. Royer*, 460 U.S. 491, 500 (1983).

[73] *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985).

[74] The appellees rely on cases such as *United States v. Bullock*, 632 F.3d 1004 (7th Cir. 2011); *United States v. Maltais*, 403 F.3d 550 (8th Cir. 2005); and *Haynie v. Cty. of Los Angeles*, 339 F.3d 1071 (9th Cir. 2003), to argue that their actions did not amount to a de facto arrest. These out-of-circuit cases, however, are inapposite. In *Bullock*, the defendant was handcuffed and placed in a patrol car for 30 to 45 minutes while the officers executed a search warrant for narcotics. *Bullock*, 623 F.3d at 1009, 1011. The Seventh Circuit found that, "while the facts . . . approach the outer boundaries of a permissible *Terry* stop," the defendant's seizure did not amount to a de facto arrest:

> Given that officers were conducting a search for drugs, it was reasonable to place [the defendant] in handcuffs and in the squad car for their safety while they pursued their investigation. . . . Drug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution. Officers could reasonably believe that [the defendant] was potentially dangerous and a flight risk because of his awareness of the search warrant, his association with the residence, and the officers' reasonable suspicion that he was involved in narcotics distribution.

No. 16-10312

allegations of Turner's complaint, the officers were not taking investigative steps to determine who he was (aside from repeatedly asking him for identification) or what threat he might have posed. Neither does anything in the amended complaint suggest that Turner had a weapon, was using his hands in a threatening way, or otherwise posed a threat that required such restraint. The officers' handcuffing Turner and placing him in the patrol car, as alleged in the amended complaint, were not reasonable under the circumstances.[75] We conclude that a reasonable person in Turner's position would have understood the officers' actions "to constitute a restraint on [Turner's] freedom of movement of the degree which the law associates with formal arrest."[76]

---

*Id.* at 1016 (citation omitted). Here, there was no suspicion that Turner was involved in a drug-related offense, and nothing in the amended complaint suggests that the officers in this case shared any of the concerns that the officers in *Bullock* had.

In *Maltais*, the Eighth Circuit held that a defendant's detention in the back of a patrol car for 2 hours and 55 minutes was not unreasonable under the circumstances, as the defendant was in a remote and isolated rural area, only 500 yards from the Canadian border, at 1:00 a.m. *Maltais*, 403 F.3d at 557. The court went to lengths to explain that "[t]he officers acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available to confirm or dispel their well-founded suspicions that [the defendant] was engaged in drug trafficking." *Id.* at 558. Indeed, the court expressly stated that "a detention of this length would be unreasonable under different circumstances." *See also Haynie*, 339 F.3d at 1077 (concluding that the handcuffing of the defendant for 16 to 20 minutes did not amount to a de facto arrest because the officer "appropriately restrained [the defendant] only to the extent necessary to complete his investigation into [a] report about men with guns").

[75] *See Sanders*, 994 F.2d at 206–07.

[76] *Carroll*, 800 F.3d at 170 (internal quotation marks omitted); *see also Massey v. Wharton*, 477 F. App'x 256, 261 (5th Cir. 2012) (per curiam) ("Tonia Massey was handcuffed and put in the back of a police car, she claims, for two-and-a-half to three hours. There is no indication that the police were investigating her for anything. Under these circumstances, any reasonable officer should have known that Tonia Massey's seizure required probable cause, not reasonable suspicion."); *Freeman v. Gore*, 483 F.3d 404, 408–09, 413 (5th Cir. 2007) (finding that "a reasonable person in [the plaintiff's] situation would surely believe that she had been restrained to an extent that normally accompanies a formal arrest" because, the plaintiff alleged, she was threatened with arrest, handcuffed, and placed in the back of the

Case: 16-10312    Document: 00513906538    Page: 20    Date Filed: 03/10/2017
Case 4:15-cv-00824-A    Document 42    Filed 03/10/17    Page 20 of 26    PageID 392

No. 16-10312

When a police detention amounts to a warrantless arrest, as Turner has alleged it did here, the arrest must be accompanied by probable cause.[77] "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."[78] "The police may take reasonable actions under the circumstances to ensure their own safety, as well as the safety of the public, during an encounter with a suspect."[79]

Based on the allegations of Turner's amended complaint, the officers lacked probable cause to arrest him, and the officers do not dispute this.[80] Turner "did not make any threats" against the officers, "did not [attempt] to leave or flee," and "did not take any aggressive actions." The only potential reason the officers gave Turner for arresting him that can be gleaned from the amended complaint is Turner's failure to identify himself: He alleges that, after he was handcuffed, Grinalds told him "[t]his is what happens when you don't ID yourself." But the police cannot arrest an individual solely for refusing

---

patrol car for 30 to 45 minutes after she refused to let sheriff's deputies search her home without a search warrant).

[77] *Freeman*, 483 F.3d at 413.

[78] *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (emphasis omitted) (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir.1996)).

[79] *United States v. Abdo*, 733 F.3d 562, 565 (5th Cir. 2013).

[80] The officers argue only that the detention did not amount to an arrest. Counsel for Driver conceded at oral argument that, if Turner was arrested, the arrest would have been unlawful because the officers lacked probable cause.

No. 16-10312

to provide identification.[81] We are satisfied that Turner has alleged a violation of his Fourth Amendment right to be free from unlawful arrest.[82]

The Fourth Amendment right to be free from arrest without probable cause was clearly established at the time of Turner's alleged arrest.[83] None of the defendants contends that any of them had probable cause to arrest Turner or that an arrest would have been objectively reasonable in light of clearly established law.[84] We are satisfied that no objectively reasonable person in these officers' position could have believed that there was probable cause to arrest Turner under the circumstances alleged in the amended complaint. Grinalds and Dyess are therefore not entitled to qualified immunity at this stage of the litigation on Turner's Fourth Amendment claim that the officers violated his right to be free from warrantless arrest absent probable cause.[85]

---

[81] *Gonzalez*, 826 F.3d at 858 (citing *Brown*, 443 U.S. at 52 ("[E]ven assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it."); *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 188 (2004)); *see also* TEX. PENAL CODE § 38.02(a).

[82] *Flores*, 381 F.3d at 402 ("An arrest is unlawful unless it is supported by probable cause.").

[83] *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009).

[84] *See id.* ("[E]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (internal quotation marks omitted)).

[85] We note the limited scope of our holding. We hold only that it was clearly established that an officer could not prolong an investigative detention without an investigatory purpose. Because the amended complaint does not allege that Turner posed any threat to the officers or that Grinalds and Dyess continued investigating while Turner was handcuffed in the back of the police car, Turner has pleaded a Fourth Amendment claim. Of course, at this stage of the proceeding, Grinalds and Dyess have not had the opportunity to explain their actions. As this case progresses, they will have the opportunity to explain why they handcuffed and detained Turner and provide evidence supporting their explanation. The facts that come to light through discovery might demonstrate that Turner's detention did not amount to a de facto arrest or that Grinalds's and Dyess's actions were not objectively unreasonable. Until then, however, qualified immunity is not proper.

No. 16-10312

2. Lieutenant Driver

Turner insists that Driver violated his Fourth Amendment rights by "continuing the unlawful seizure and subsequent handcuffing and arrest and keeping Turner locked in the back of the police car after Driver arrived on the scene."

Supervisory officials are not liable under § 1983 for the actions of subordinates on any theory of vicarious liability.[86] Accordingly, Driver is not liable for the actions of Grinalds and Dyess before he arrived on the scene. We thus must determine whether Turner has alleged a separate violation of his constitutional rights by Driver after he arrived and whether Driver's actions were objectively reasonable when viewed in the light of clearly established law.

To be liable under § 1983, Driver must have been personally involved in the alleged constitutional deprivation or have engaged in wrongful conduct that is causally connected to the constitutional violation.[87] Personal involvement of supervising personnel generally includes giving a "command, signal, or any other form of direction to the officers that prompted" the detention or arrest.[88] According to Turner's allegations, he was already in handcuffs and in the back seat of the patrol car when Driver arrived on scene. Turner asserts that Driver talked with Grinalds and Dyess and then approached Turner to determine what had transpired. The allegations of the amended complaint indicate that Driver investigated the situation

---

[86] *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).

[87] *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008).

[88] *Id.*; *see also Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) ("To show personal involvement, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." (internal quotation marks omitted)); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) ("A plaintiff may satisfy [the personal involvement] standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance.").

No. 16-10312

immediately upon arrival by consulting with Grinalds and Dyess and talking
with Turner, and then promptly released Turner. Turner has failed to allege
any personal involvement in his arrest or any conduct on Driver's part that
indicates he unreasonably prolonged Turner's detention or arrest. The facts
alleged in Turner's amended complaint demonstrate that Driver "diligently
pursued a means of investigation that was likely to confirm or dispel [the
officers'] suspicions quickly."[89] Turner has failed to allege that Driver violated
Turner's Fourth Amendment rights to be free from detention absent
reasonable suspicion and from unlawful arrest. Even if Turner had sufficiently
alleged a constitutional violation, Driver acted objectively reasonably in light
of the circumstances—namely, by apprising himself of the situation and acting
accordingly. Driver is therefore entitled to qualified immunity on Turner's
Fourth Amendment claims.

## IV.
### CONCLUSION

We affirm the district court's grant of qualified immunity to Grinalds,
Dyess, and Driver on Turner's First Amendment claim and on his Fourth
Amendment claim for unlawful detention. With respect to Turner's Fourth
Amendment claim for unlawful arrest, we affirm the district court's grant of
qualified immunity as to Driver, but we reverse as to Grinalds and Dyess and
remand for further proceedings on that claim.

AFFIRMED in part; REVERSED and REMANDED in part.

---

[89] *Sharpe*, 470 U.S. at 686.

No. 16-10312

EDITH BROWN CLEMENT, Circuit Judge, dissenting as to Parts III.A.2 & III.B.1.b:

I respectfully dissent from the majority's dicta purporting to clearly establish a First Amendment right to film the police and from the majority's reversal of the district court's grant of qualified immunity to Officers Grinalds and Dyess regarding Turner's unlawful arrest claim.

The Supreme Court has repeatedly held that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *See, e.g., Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

I

The majority asserts, unconnected to the particular facts and unnecessary to the disposition of this case, that "a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions." The majority derives this general right to film the police from "First Amendment principles, controlling authority, and persuasive precedent." But the Supreme Court has repeatedly reversed attempts to define "clearly established law" at such "a high level of generality." *White*, 137 S. Ct. at 552.

A law is not clearly established unless and until there is "directly controlling authority" or "a consensus of cases of persuasive authority such

24

No. 16-10312

that a reasonable officer could not have believed that his actions were lawful." *Gonzalez v. Huerta*, 826 F.3d 854, 858 (5th Cir. 2016) (emphasis omitted). To the extent there is any consensus of persuasive authority, those cases focus only on the narrow issue of whether there is a First Amendment right to film the police "carrying out their duties in public." *E.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). Turner did not allege that he filmed police officers conducting their public duties, but rather that he filmed a police station.

The majority does not determine that the officers here violated Turner's First Amendment rights—perhaps because it would be reasonable for security reasons to restrict individuals from filming police officers entering and leaving a police station. Because the majority does not hold that the officers actually violated the First Amendment, "an officer acting under similar circumstances" in the future will not have violated any clearly established law. *See White*, 137 S. Ct. at 552.

II

The majority reverses the district court's grant of qualified immunity to Officers Grinalds and Dyess regarding Turner's unlawful arrest claim, holding that "it was clearly established that an officer could not prolong an investigative detention without an investigatory purpose." But the majority "fail[s] to identify a case where an officer acting under similar circumstances as [Officers Grinalds and Dyess] was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. Turner alleged only that he was in the police car "a while"—he failed to specify the length of the investigative detention. Perhaps more importantly, Turner clearly alleged that he "asked for a supervisor to come to the scene." Neither Turner nor the majority identify any case clearly establishing that an officer violated the Fourth Amendment

No. 16-10312

when he extended an investigative detention because the detained individual "asked for a supervisor to come to the scene."

Because Turner himself requested a supervisor, a reasonable police officer in that situation could believe that waiting for the supervisor to arrive at the scene did not transform Turner's detention into a de facto arrest. At the very least, Officers Grinalds and Dyess did not act objectively unreasonably in waiting for the requested supervisor—especially because Lieutenant Driver had to come from the Fort Worth Police Station across the street. Accordingly, I respectfully dissent from the majority's reversal of the district court's grant of qualified immunity to Officers Grinalds and Dyess on Turner's unlawful arrest claim.